UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| TERESA C. BROWN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 4:08-CV-62-RLM-APR |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant | ) | |

OPINION and ORDER

Teresa Brown appeals a final decision of the Commissioner of Social Security denying her January 21, 2006 applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). Ms. Brown claims that she is entitled to benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382(a), because she has been disabled since May 27, 2005. Her alleged disability results from a May 1999 closed head injury and its residual effects, including post concussive syndrome, headaches, decreased fine motor coordination, depression, anxiety, and cognitive decline affecting her ability to concentrate, remember information, and learn new material.

Ms. Brown's initial claim and request for reconsideration were denied. An Administrative Law Judge conducted a hearing in June 2007. The ALJ denied Ms. Brown's applications on the ground that she was capable of performing her past relevant work as a customer service manager and mortgage clerk. The ALJ further

decided that Ms. Brown could perform jobs that existed in significant numbers in the national economy. The Appeals Council denied Ms. Brown's request for review, making the ALJ's decision the Commissioner's final decision.

Ms. Brown contends the ALJ's decision isn't supported by substantial evidence and is contrary to law. Ms. Brown contends that the ALJ didn't explain sufficiently why he rejected Dr. Walsh's opinion, didn't consider the limitations imposed by her mental problems in deciding her residual functional capacity, and erroneously found that Ms. Brown could perform her past work and other work in the economy.

With jurisdiction established pursuant to 42 U.S.C. § 405(g), the court reverses the Commissioner's decision for the following reasons.

BACKGROUND

At the onset of Ms. Brown's disability she was a younger individual; she turned fifty by the time of the ALJ's decision. 20 C.F.R. §§ 404.1563, 416.963. Ms. Brown has a high school education and past work experience as a customer service manager, retail store manager, mortgage clerk, and dispatcher for a trucking company. Ms. Brown says she became disabled on May 27, 2005, after falling from a construction trailer and lacerating her head in May 1999.

*Medical Evidence*

Ms. Brown doesn't allege a physical disability aside from her well-documented report of headaches. After her accident, financial pressure forced her

to move in with her son. Ms. Brown now receives workers' compensation and lives alone again.

R. Newton, M.D., examined Ms. Brown for workers' compensation purposes in March 2006. Ms. Brown complained of memory loss, migraine headaches, and difficulty concentrating. Dr. Newton reported that Ms. Brown had no physical abnormalities, no sign of unsteadiness, a normal gait, a negative straight-leg raising test, the ability to walk on her heels and toes, and the ability to bend over without difficulty. Her neurological exam and range of motion were normal. Dr. Newton diagnosed posttraumatic head injury, migraine headaches, anxiety, depression, tobacco abuse, and obesity.

In April 2006, state agency physician A. Dobson, M.D., reviewed medical records and determined that Ms. Brown's physical examination findings were normal. Dr. Dobson concluded that there was too little evidence to show that Ms. Brown suffered from a severe impairment. State agency physician, Dr. Ruiz, M.D., also reviewed the medical evidence and agreed that Ms. Brown didn't suffer from a severe impairment.

Even though a CT scan and MRI taken after the accident were unrevealing, Ms. Brown's work history and medical reports indicate the residual mental problems she has suffered since the 1999 accident. Ms. Brown returned to work at Meijer just three months after the accident; restructuring eliminated her job in January 2004. Ms. Brown then became a retail manager at the Factory Card and Party Outlet for four to five months during which she began noticing memory deficits and started using index cards to help with her memory problems. Ms.

Brown then accepted a better offer to become the store manager at Kirkland's. That job required her to work seventy hours a week, which she did for nine months. Ms. Brown again reported that her memory problems affected her job performance, because she kept doing things backwards and felt "crazy." Ms. Brown claimed that the district manager talked to her about her disorganization and difficulties with communication, but no supervisor ever issued written criticisms.

Neurologist David Larsen, M.D., first treated Ms. Brown on June 3, 1999. Ms. Brown had been suffering from "chronic daily headaches as well as dizziness which worsen[ed] with position" since her accident. She also was experiencing nausea, memory problems, and some visual problems. Dr. Larsen diagnosed her with post concussive syndrome with significant positional vertigo, and daily headaches with a potential vascular/migraine component to them. Ms. Brown reported that her medicine didn't make her headaches go away completely, but on a numeric pain scale she estimated that the headaches went from nine or ten (out of ten) to a lesser pain of four or five. She continued to experience mild dizziness with memory and visual problems. She returned to part-time work, but occasionally slept all day. By August, Dr. Larsen reported that Ms. Brown was having fewer headaches and less dizziness, and improved memory, vision, and balance. Overall, Ms. Brown had "about four or five days where she [was] doing really well and then a couple of days where she [could] barely get out of bed or do very much." At her September examination, Ms. Brown was significantly better, with her post concussive syndrome reaching "almost complete improvement."

Despite some mild visual problems, Ms. Brown agreed to return to full-time work. Ms. Brown returned to Dr. Larsen in November, indicating that since she returned to work, she suffered from one migraine a week, intermittent episodes of confusion, difficulty with balance, and trouble verbally expressing herself. Dr. Larsen reported that her post concussive syndrome had worsened slightly with the increased stress of returning to work, and decided to wean her off the medications at a slower rate.

In January 2000, Dr. Larsen noted that a sinus infection slowed Ms. Brown's recuperation from post concussive syndrome, and she had gained weight. Dr. Larsen changed her medications, and again hoped to taper her off of them. Late in 2000, Dr. Larsen reported that Ms. Brown was improving slowly from her post concussive syndrome, but continued to have headaches.

Ms. Brown next saw Dr. Larsen in November 2001. Ms. Brown continued to take Midrin for headaches, but Dr. Larsen thought that she was doing relatively well despite having poor sleep and weight gain. Ms. Brown didn't see Dr. Larsen again until February 2003, when she complained of headaches lasting several days, trouble with word finding, and difficulty sleeping. Dr. Larsen noted that Ms. Brown had problems finding words during the examination. His impression was that her post concussive syndrome had reached maximal medical treatment, although she continued to suffer from occasional migraines, poor sleep, and word finding trouble.

By July 2003, Ms. Brown was having only one headache per month. She recently had suffered a significant attack of respiratory distress and was told she

might have pneumonia or lupus. Dr. Larsen reported that her neurological exam revealed a ptosis that was fatiguable in her right eye and mild fatigability of her grip. Ms. Brown returned to Dr. Larsen in July 2004 because she was experiencing more frequent headaches that were exacerbated by the stress of being laid off and trying to get workers' compensation to pay for her medical bills. She reported having two headaches a week, occasionally with nausea and dizziness. Dr. Larsen noted that Ms. Brown was alert and oriented, and her mental status exam was unremarkable. He opined that Ms. Brown continued to suffer from chronic migraines due to poor sleep and post concussive syndrome caused by her 1999 accident. He prescribed Effexor for her headaches.

Ms. Brown saw Dr. Larsen in June 2005 with complaints of memory problems, particularly when she was stressed and agitated. She also reported that she was having trouble with numbers, learning new things, and word finding. Ms. Brown tried working other less stressful jobs since Meijer, but she couldn't tolerate learning new things, and suffered from headaches and poor sleep. Her mental status examination was unremarkable, and Dr. Larsen switched her to Cymbalta.

In August 2005, neurologist Morris Fisher, M.D., conducted an independent medical evaluation of Ms. Brown. Ms. Brown reported experiencing dizziness, short-term memory problems, difficulty retaining new material, and frequent severe stress-related headaches two or three times each week which were aggravated by noise, but not light. Ms. Brown usually found relief with two to three Midrin tablets or, if necessary, Butalbital. She denied having similar

headaches before the accident. Dr. Fisher indicated that Ms. Brown was fully alert with fluent speech, and was able to complete some arithmetic and memory questions. Ms. Brown's gait, reflexes, muscle strength, muscle tone, and rapid alternative movements were normal, and she could stand on each leg with her eyes closed without difficulty. After reviewing reports Ms. Brown's counsel had provided, Dr. Fisher indicated that her symptoms were consistent with post concussive or posttraumatic syndrome, but questioned whether the nature of the deficit could be defined or how it could be managed. Dr. Fisher recommended neuropsychological testing for Ms. Brown, and referred her to neurologist Dr. Patrick Walsh, a licensed psychologist.

Dr. Walsh examined Ms. Brown in October and November 2005 and completed a neuropsychological consultation. Ms. Brown reported problems with her memory, new learning, concentration, naming, word finding, and organizing her thoughts since her accident. She also complained of headaches, and reported that it took her longer to perform most tasks. Dr. Walsh noted that Ms. Brown had a full affect and a variable mood, which was mildly anxious. Ms. Brown's average IQ scores were near ninety, and she read at a high school level, but her math scores were at an eighth grade level. Ms. Brown achieved average scores in adaptive problem solving and abstract reasoning, with no evidence of decline in those abilities, but her attention and memory scores were below average to average. Her performance on tasks requiring digit repetition and visual-motor speed was below average. Her performance of tasks requiring complex attention was moderately impaired. The speed at which Ms. Brown could read words and

name colors was two standard deviations below the mean, and she demonstrated below average immediate acquisition.

Dr. Walsh noted that Ms. Brown's mild difficulties of encoding and retrieval functions and overall pattern of neurocognitive functioning was consistent with post concussive syndrome. He recommended that Ms. Brown minimize exposure to situations requiring her to learn new tasks under time pressure, or to learn more than one task at a time. He also recommended that she work in situations structured in a fashion that allowed her to use "compensatory strategies." Dr. Walsh opined that Ms. Brown was a good candidate for cognitive retraining, and after noting that she showed mild symptoms of depression and anxiety, recommended that she receive antidepressant medication and psychotherapy to help her cope.

Dr. Larsen's January 2006 examination of Ms. Brown was unremarkable. Despite her once well-controlled headaches, Ms. Brown reported that she wasn't doing well, wasn't sleeping well, and was more stressed and depressed. Dr. Larsen observed that Ms. Brown was "obviously depressed" and recommended changing her medications. In February 2006, Ms. Brown reported to Dr. Larsen that her headaches were doing "significantly better." About the same time, Ms. Brown filled out a headache questionnaire for disability benefits and indicated that she usually got headaches three to four times a week, which normally lasted about twenty-four hours, and were controlled by five Midrin and sometimes Butalbital. She reported that her headaches were caused by "weather changes, stress, lack of sleep, doing too much, not enough rest, or no known reason." If she woke up with

a headache or got one during the day, she took her medication and went back to bed because the Butalbital made her "incapacitated."

Social worker Julia Mills, LCSW, performed an intake assessment of Ms. Brown in March 2006 for the Alpine Clinic. Ms. Mills acknowledged Ms. Brown's reported problems that all started after her accident, including difficulties with balance, short-term memory, anxiety, staying on task, and misplacing objects. Ms. Brown managed her own personal hygiene, lived alone, and drove a car, but sometimes got lost or confused while driving. She was able to watch television, work on crafts, and attend church. Ms. Mills assessed posttraumatic stress disorder and adjustment disorder with mixed anxiety and depressed mood, both chronic, and reported a Global Assessment of Functioning[1] of 47.[2] Ms. Mills indicated that Alpine Clinic would provide therapy to assess the degree of Ms. Brown's cognitive limitations and develop coping mechanisms for her.

Also in April 2006, Ms. Brown underwent a consultative psychological examination with clinical psychologist David Jarmon, Ph.D. After reviewing Ms. Brown's 2005 neuropsychological examination, Dr. Jarmon noted that her

---

[1] *See* American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (American Psychiatric Association, 4th ed. 2000) ("DSM-IV") (A Global Assessment of Functioning scale rating is used for reporting a clinician's judgment of an individual's overall level of functioning and ability to carry out activities of daily living. The Global Assessment of Functioning rating is determined by utilizing a 100-point scale to measure the overall level of psychological, social, and occupational functioning of the individual on a hypothetical continuum).

[2] A Global Assessment of Functioning rating of 41-50 indicates severe symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). <u>Id</u>.

memory functioning was generally below average to average, and that she displayed some "mild impairment of attention, processing speed and memory." Dr. Jarmon administered a Wechsler Memory Scale-Third Edition (WMS-III) exam, which revealed that Ms. Brown's weakest area of functioning was her immediate memory, yet in recognition she scored in the high average range. Ms. Brown's General Memory Index fell into the borderline range, and Dr. Jarmon suspected that her overall memory functioning was stronger before the accident. Ms. Brown reported problems with word finding and short-term memory, and said she had difficulty reading because she would forget what she read. Ms. Brown correctly answered a number of math, knowledge, and reasoning questions, could recall remote information, and repeat five digits forward and four backward, but could only recall one out of three items after a five minute delay. Ms. Brown could also perform multiplication, division, two-digit addition, and single-digit subtraction, but not serial sevens subtraction. Dr. Jarmon assessed Ms. Brown with dementia due to head trauma, and assigned her a Global Assessment of Functioning of 60/65.[3]

In May 2006, state agency psychologist Fred Kladder completed a psychiatric review technique form and opined that as a result of an organic mental

---

[3]A Global Assessment of Functioning rating of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers), while a Global Assessment of Functioning rating of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well with some meaningful interpersonal relationships. Id.

disorder of memory impairment, Ms. Brown had mild restrictions in her daily living activities and in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. Ms. Brown reported difficulty dealing with new information on an immediate basis, as well as problems with task completion—such as forgetting that she started a load of laundry. Dr. Kladder noted that Ms. Brown's brain injury was in the remote past, that she was able to work for several years after her accident, and that her recent consultative examination diagnosed post concussive dementia. Dr. Kladder acknowledged that Ms. Brown could care for herself and do basic household tasks on a routine and regular basis. He opined that Ms. Brown was moderately limited in her ability to understand, remember, and carry out detailed instructions, and moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." He also found that she was moderately limited in her ability to interact with the general public. Dr. Kladder concluded that Ms. Brown had the mental residual functional capacity to perform simple, repetitive tasks. State agency psychologist William Shipley, Ph.D., reviewed the medical file in July 2006 and agreed with Dr. Kladder's opinion.

In September 2006, Ms. Brown saw Dr. Larsen again. This time she reported that her headaches were occurring two or three times a week and she continued to have trouble sleeping. She was taking at least five tablets of Midrin along with Butalbital to get relief from her headaches. She got more confused with

an increase in stress and felt "scattered" in her thinking. Dr. Larsen thought that as long as there was no stress, Ms. Brown seemed to do quite well and was even thinking about returning to work. He reported that her depression seemed to be somewhat better, but her chronic migraines seemed to be a continuous problem.

In April 2007, Ms. Brown went to Dr. Larsen with headaches lasting for two or three days, but then having three to four weeks without any problems. Ms. Brown indicated that her sleep had improved, but she was still having cognitive difficulties. Dr. Larsen noted that she lost thirty-eight pounds, and appeared alert and oriented. Her cognitive and cerebellar exams were unremarkable, she had a full range of motion in her head and neck, and a normal gait. Dr. Larsen recommended that she stop smoking and continue with her vocabulary rehabilitation. He suspected that while Ms. Brown was "convinced that she is disabled," he tended to believe she wasn't.

*Vocational Counselor Evaluation*

In March 2007, vocational counselor Joseph Belmonte completed a vocational evaluation after interviewing Ms. Brown and reviewing her medical records. Mr. Belmonte noted that Ms. Brown completed high school, but not college courses, and was familiar with Microsoft office products, but not at a marketable level. Mr. Belmonte considered Ms. Brown's work history, which involved work in retail management at Meijer, the Factory Card and Party Outlet, and Kirkland's; work as a secondary bank mortgage clerk from 1992 to 1994 putting files together but not initiating loans or contacting customers; and work

as a local dispatcher for two years at a trucking company.

After his review, Mr. Belmonte concluded that there was no evidence that Ms. Brown couldn't return to work in occupational areas that didn't generally require the stress and pressure of meeting deadlines, the supervision of others, or the implementation of business strategy. Mr. Belmonte opined that Ms. Brown remained employable, and recommended "facilitating her return to work in entry-level clerical positions, low level customer service occupations, retail sales occupations, work as a cashier, certain types of occupations in food or hospitality services, etc." He further recommended that "comprehensive vocational rehabilitation activities be implemented. . . . [to which] Ms. Brown [would] need to be committed. . . and prepared to confront the symptoms of her stress and anxiety in a productive manner and work to allow herself not to be overwhelmed by symptoms." The ALJ ultimately "base[d]" his findings upon Mr. Belmonte's evaluation.

*Hearing Testimony*

Ms. Brown testified at the administrative hearing in the presence of her counsel. When she worked as a customer service manager at Meijer, Ms. Brown said, she was in charge of team members and managed the customer service area, including the cashiers, service desk, cash office, costumer complaints, pricing integrity, cash control, hiring, and staff discipline. Ms. Brown then became store manager at the Factory Card and Party Outlet, until she received a better job offer to become Kirkland's store manager. Ms. Brown testified that she eventually left

Kirkland's because she was "too stressed" and "just couldn't do it any more." She began vocational computer training, but described learning difficulties because of her inability to remember anything new. Reflecting on her past work experience as a secondary mortgage clerk where Ms. Brown completed "follow-up paperwork," she didn't think she could do the job now or remember how to perform it, unless nothing had changed in the business.

When asked about Mr. Belmonte's assessment that she could perform low-level customer service (i.e., a job "like what one of the people [Ms. Brown] supervised does, or cashier, [or] retail sales"), Ms. Brown responded that she couldn't deal with the confrontation involved in retail, because distractions and stress confused her and impeded her ability to function. When asked whether she could do the exact same thing all day long, such as making "widgets," Ms. Brown indicated that meeting quotas would be too stressful for her.

Ms. Brown admitted that she lived by herself, paid her own bills, designed purses as a hobby without successfully completing one, and cooked for herself, but only one dish at a time. She lived by a routine, and if she got distracted she couldn't "get back into sequence." She could drive, and went to her son's house once a week—but sometimes forgot where she was going. Ms. Brown testified that she was recently participating in cognitive therapy, but she had trouble getting Meijer to consistently pay for it. Ms. Brown concluded ". . . [t]here are times when I think I could just go back to work and be just fine. . . And then there are days when I think there is no way. . . I never can see any consistency about being able to do it more than a day or two at a time." According to Ms. Brown, her

functioning depended on how many migraines she had that week, how much stress she felt, how much confusion she endured, and how many times she was distracted or had her routine broken.

*The ALJ's Decision*

The ALJ decided that Ms. Brown met the insured status requirements of the Social Security Act through December 31, 2010, and hadn't engaged in substantial gainful activity since May 27, 2005, due to the severe impairments of post concussive syndrome and depression. The ALJ decided that Ms. Brown's impairments or combination of impairments didn't meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").

The ALJ concluded that Ms. Brown had the residual functional capacity to perform a full range of work at all exertional levels, with some nonexertional limitations, including no work "where the stress and pressure of meeting deadlines and where having clear time frame responsibilities for the supervision of others and for the implementation of business strategy are required." The ALJ decided Ms. Brown was capable of performing her past relevant work as a mortgage clerk and as a customer service manager at Meijer, but couldn't perform as a retail store manager at the Factory Card and Party Outlet or Kirkland's because those jobs required her to learn new tasks, work under stress and the pressure to meet deadlines, supervise others, and implement business strategies. Nor could Ms. Brown perform her past work as a dispatcher, due to the stress and

pressure of directing, controlling, or planning the work of others and coordinating data.

The ALJ found that since Ms. Brown's ability to perform a full range of work at all exertional levels was compromised only by nonexertional limitations that had little or no effect on the occupational base of unskilled entry level work at all exertional levels, pursuant to § 204 of the Medical-Vocational Guidelines, Ms. Brown could perform jobs that existed in significant numbers in the national economy. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00; Social Security Ruling ("SSR") 85-15.


STANDARD OF REVIEW

Judicial review of the Commissioner's decision is limited. The issue isn't whether Ms. Brown is disabled, but whether substantial evidence and the law support the ALJ's determination that she was not. Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In making a substantial evidence determination, the court reviews the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. Williams v. Apfel, 179 F.3d 1066, 1071-1072 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000). Thus, if reasonable minds could disagree on whether an individual is disabled, the

court must affirm the Commissioner's decision denying benefits. <u>Schmidt v. Apfel</u>, 201 F.3d 970, 972 (7th Cir. 2000); <u>Books v. Chater</u>, 91 F.3d 972, 978 (7th Cir. 1996). Still, the court must review the evidence critically and not simply rubber-stamp the Commissioner's decision. <u>Clifford v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000).

Discussion

To be eligible for disability insurance benefits and SSI, a claimant must have a disability under the terms of the Social Security Act. 42 U.S.C. § 423; <u>Estok v. Apfel</u>, 152 F.3d 636, 638 (7th Cir. 1998).[4] The claimant must show, through testimony and medical evidence supported by clinical data and laboratory diagnosis, that she was disabled during the period in which she was insured. <u>Reading v. Matthews</u>, 542 F.2d 993, 997 (7th Cir. 1976) (citing <u>Jeralds v. Richardson</u>, 445 F.2d 36 (7th Cir. 1971)). The claimant must show that she can't "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry

---

[4]The regulations governing the determination of disability for disability insurance benefits are found at 20 C.F.R. § 404.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical in all respects relevant to this case, reference will only be made to the disability insurance benefits' regulations for purposes of clarity.

for determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

1. Whether the claimant is currently employed;
2. Whether the claimant has a severe impairment;
3. Whether the claimant's impairment meets or equals one listed by the Secretary;
4. Whether the claimant can perform her past work; and
5. Whether the claimant is capable of performing any work in the national economy.

*See* Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). Ms. Brown bears the burden in steps one through four; only at step five does the burden shift to the Commissioner. Bolinger v. Barnhart, 446 F.Supp.2d 950, 955 (N.D. Ind. 2006).

Ms. Brown challenges the ALJ's residual functional capacity determination and his decision at steps four and five of the sequential evaluation. Ms. Brown asks the court to reverse the ALJ's decision and award benefits or remand the case for a new hearing.

*Weight Afforded to Medical Opinions*

Ms. Brown argues that the ALJ favorably discussed Dr. Walsh's report, but then "rejected part of Dr. Walsh's report," "discredited" his findings, and afforded more weight to the opinions of Drs. Kladder and Shipley, without adequate explanation. Ms. Brown misunderstands the ALJ's reliance upon Dr. Walsh's opinion.

After detailing Dr. Walsh's evaluation and recommendations, the ALJ stated, "[Dr. Walsh's] opinion is given significant weight, as it is based on extensive

testing and evaluation and is consistent with Dr. Larsen's and Dr. Jarmon's comments. Furthermore, Dr. Walsh's opinion is not contradicted by another medical source, and it is supportive of the vocational counselor's opinion." T.R. 20.

It doesn't appear that the ALJ discredited Dr. Walsh's opinion, or afforded any part of it less weight than other medical opinions. Ms. Brown doesn't refer to specific language in which the ALJ rejected Dr. Walsh's opinion; no such language exists. The ALJ didn't discount Dr. Walsh's opinion, but rather assigned it significant weight.

The contention that the ALJ agreed with Dr. Walsh's opinion but didn't incorporate Dr. Walsh's recommendations into the residual functional capacity determination raises a separate matter.

*Residual Functional Capacity Assessment*

The ALJ must determine the claimant's residual functional capacity before performing steps four or five. <u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004). Residual functional capacity is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. <u>Id</u>.; 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1); SSR 96-8p. This finding must be assessed based on all the relevant evidence in the record, 20 C.F.R. § 404.1545(a)(1), and must be supported by substantial evidence. <u>Clifford v. Apfel</u>, 227 F.3d 863, 873 (7th Cir. 2000). The ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one. *See* 20

C.F.R. § 404.1527(e).

Ms. Brown says the ALJ didn't consider her mental limitations properly in determining her residual functional capacity. The court agrees. The ALJ didn't accurately incorporate his findings about her mental limitations into the residual functional capacity determination, or include a thorough discussion of the medical evidence of record.

In determining the severity of Ms. Brown's mental impairments, the ALJ was required to address her degree of functional limitation pursuant to the technique set forth in 20 C.F.R. § 404.1520(a). *See* <u>Craft v. Astrue</u>, 539 F.3d 668, 674-675 (7th Cir. 2008) (finding that if the claimant has a medically determinable mental impairment, the ALJ must document that finding, and rate the degree of functional limitation in four broad areas known as the "B criteria": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 *et. seq.*).

The ALJ stated that Ms. Brown's mental impairments caused a mild limitation in her ability to perform activities of daily living because she generally completed her activities without difficulty, despite demonstrating some "distractibility." Although Drs. Kladder and Shipley felt that Ms. Brown had a moderate limitation in dealing with the general public, the ALJ concluded that she suffered only mild limitations with social functioning—she wasn't very social, became frustrated when confused, and was irritable on a daily basis, but she still lunched with family, paid bills, shopped, and attended church. Ms. Brown

experienced no episodes of decompensation, but had difficulties with concentration, persistence, and pace, which was revealed by her inability to concentrate for longer than thirty minutes to one hour, and her need to work alone and use memory joggers in order to concentrate better and complete tasks. "Consistent with the determination of the DDS reviewing psychologists," the ALJ determined that Ms. Brown's limitations with regard to concentration, persistence, or pace were moderate, and explained that:

> [T]he claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions. . . complete a normal work day and work week without [psychologically-based] interruptions. . . and to perform at a consistent pace without an unreasonable number and length of rest periods. . . to the extent that. . . cognitive retraining and memory joggers. . . enable the claimant to concentrate well and to complete even detailed tasks, provided that she is not under stress and pressure.

T.R. 19.

With no more than mild or moderate limitations in the first three of the B criteria, and no limitation in the fourth area, the ALJ concluded that Ms. Brown's mental impairments were non-severe and didn't meet one of the Listings. In assessing Ms. Brown's residual functional capacity however, the ALJ still was required to consider all of her medically determinable impairments, even those that weren't considered severe. Craft v. Astrue, 539 F.3d at 676 (citing 20 C.F.R. § 404.1545(a)(2), (b),(c)). Mental limitations must be part of the residual functional capacity assessment, because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work

pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." Id.

The ALJ determined that Ms. Brown retained the residual functional capacity to do a full range of work at all exertional levels as long as she avoided the stress and pressure of meeting deadlines, responsibility for the supervision of others, and implementing business strategy. This assessment didn't include work restrictions that accounted for Ms. Brown's difficulty with detailed instructions, concentration, persistence, or pace, and her potential need for additional breaks, appropriate retraining, and/or memory joggers to enable her to work a normal work day and week. The residual functional capacity assessment also didn't accommodate Ms. Brown's mild limitations with social functioning and possible need to work alone in order to concentrate and complete tasks. And despite giving "significant weight" to Dr. Walsh's recommendation that Ms. Brown "minimize her exposure to situations requiring her to learn new tasks under time pressure [and to]. . . acquire new tasks one at a time," the ALJ didn't expressly include those limitations in the residual functional capacity determination.

Avoiding stress and pressure at work, as generally prescribed in the ALJ's residual functional capacity finding, isn't equivalent to the more restrictive limitations that Ms. Brown experiences and that the ALJ acknowledged but didn't include in the residual functional capacity. As a result, the court cannot know whether Ms. Brown's specific identified limitations were considered with respect to the ALJ's decision that Ms. Brown was capable of performing a full range of work at all exertional levels.

An ALJ is free to formulate his mental residual functional capacity finding in terms that explain the 'type of work' a claimant is able to perform, but the record must adequately support the conclusion. *See* Craft v. Astrue, 539 F.3d at 677-678. This isn't a case where the ALJ relied upon a medical source's translation of Ms. Brown's mental health deficits into a specific residual functional capacity finding. *See* Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002). The ALJ didn't even mention the conclusion reached by the only medical source that translated Ms. Brown's mental health limitations into a residual functional capacity—Dr. Kladder, who opined that Ms. Brown had the mental residual functional capacity to perform "simple, repetitive tasks." Nor did the ALJ discuss that another state agency psychologist agreed with Dr. Kladder's conclusion. Although the ALJ mentioned the vocational counselor's recommendation that Ms. Brown return to "unskilled jobs," the ALJ didn't explain adequately why he disagreed with the relevant record evidence and felt that Ms. Brown "has the residual functional capacity to perform skilled or semi-skilled work." T.R. 21.

The ALJ also appears to have ignored the conflicting Global Assessment of Functioning ratings assigned by Ms. Mills[5] and Dr. Jarmon only days apart. While a Global Assessment of Functioning score isn't essential to a residual functional capacity's accuracy, it can be of considerable help in formulating the residual functional capacity. *See* Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). As to Ms. Brown, the ratings indicated potentially

[5] Ms. Mills' opinion can properly be considered as evidence from an "other source" under 20 C.F.R. § 404.1513(d).

serious to moderate impairments in social, occupational, or school functioning. *See* DSM-IV.

An ALJ needn't discuss every piece of evidence in the record, <u>Terry v. Astrue</u>, 580 F.3d 471, 477 (7th Cir. 2009), but because the ALJ didn't articulate his reasons for ignoring or rejecting relevant medical evidence, *see* SSR 96-8p, the court can't trace the path of the ALJ's reasoning. *See* <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994) (an ALJ's decision must be based upon consideration of all the relevant evidence and the ALJ must articulate at some minimal level his analysis of the evidence). While the erroneous residual functional capacity finding is sufficient to reverse the Commissioner's decision, for the purposes of remand, the court also addresses the ALJ's step four analysis.

*Step Four*

After making the residual functional capacity determination, the ALJ must decide what, if any, employment the claimant is capable of performing. 20 C.F.R. § 404.1520(e). To decide whether the claimant's residual functional capacity permits her to perform her past relevant work, the ALJ must compare the past works' demands with her present capacities. <u>Strittmatter v. Schweiker</u>, 729 F.2d 507, 509 (7th Cir. 1984). The ALJ can "base his comparison on the functional demands and job duties of the applicant's past occupation as generally required by employers throughout the national economy." <u>Orlando v. Heckler</u>, 776 F.2d 209, 215-216 (7th Cir. 1985) (citing SSR 82-61). A claimant who "cannot perform the excessive functional demands and or job duties actually required in the former

job but can perform the functional demands as generally required by employers throughout the economy" should be found not disabled. Smith v. Barnhart, 388 F.3d 251, 253 (7th Cir. 2003).

The ALJ believed that Ms. Brown had the capacity to return to work as a mortgage clerk because "[t]his work, as actually and generally performed, did not involve the stress and pressure of meeting deadlines, supervising others within time frames, or implementing business strategies." T.R. 21. But the ALJ didn't discuss whether the job required Ms. Brown to quickly learn tasks, or to learn more than one task at a time.[6] Ms. Brown's testimony suggests that she couldn't perform this job now, unless "nothing had changed in that business." Despite Ms. Brown being limited by her task-acquiring skills, the ALJ didn't discuss whether Ms. Brown could, almost twenty years later, complete the tasks required of a mortgage clerk—because either nothing had changed in the job, or if it had, Ms. Brown was capable of handling the changes.

Reliance on DOT 249.362-014 for the mortgage clerk job description[7]

---

[6] The ALJ did mention that Ms. Brown's difficulty with learning new tasks would prevent her from acting as a store manager for Kirkland's or for the Factory Card and Party Outlet.

[7] DOT 249.362-014 describes the duties of a mortgage clerk, as follows:

Performs any combination of following duties to process payments and maintain records of mortgage loans: Types letters, forms, checks, and other documents used for collecting, disbursing, and recording mortgage principal, interest, and escrow account payments, using computer. Answers customer questions regarding mortgage account and corrects records, using computer. Examines documents such as deeds, assignments, and mortgages, to ensure compliance with escrow instructions, institution policy, and legal requirements. Records disbursement of funds to pay insurance and tax. Types notices to government, specifying changes to loan

further undermined the ALJ's decision. The DOT description entails skills that (according to the record) Ms. Brown likely didn't use at the job, including serving customers, calculating account balances, ordering insurance, and entering data using a computer. Yet the DOT job description doesn't include the skills Ms. Brown apparently did use—as the ALJ acknowledged, she "put files together . . . [but] did not perform customer service or have customer contact, and she never initiated loans." T.R. 21.

There is insufficient evidence to conclude that the DOT job description relied on by the ALJ accurately reflects Ms. Brown's past work experience. Nor is there sufficient evidence to determine whether Ms. Brown's actual nonexertional limitations, including her inability to quickly learn new tasks, would prevent her from performing the job duties required, or as generally required by employers throughout the economy. *See* Getch v. Astrue, 539 F.3d 473, 482 (7th Cir. 2008) (the ALJ need not conclude that the claimant is capable of returning to the precise job she used to have; it is enough that the claimant can perform jobs substantially like that one).

---

documents, such as discharge of mortgage. Orders property insurance policies to ensure protection against loss on mortgaged property. Enters data in computer to generate tax and insurance premium payment notices to customers. Reviews printouts of allocations for interest, principal, insurance, or tax payments to locate errors. Corrects errors, using computer. May call or write loan applicants to obtain information for bank official. May be designated according to type of work assigned as Escrow Clerk (financial); Foreclosure Clerk (financial); Insurance Clerk (financial); Tax Clerk (financial).

U.S. Department of Labor, Office of Administrative Law Judges Law Library, DOT, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02C.HTM (last visited Nov. 30, 2009).

The other job to which the ALJ found Ms. Brown could return was her customer service manager position at Meijer. The decision doesn't explain how Ms. Brown could perform as a customer service manager, yet "avoid work where the stress and pressure of meeting deadlines,. . . responsibilities for the supervision of others and. . . implementation of business strategy are required." T.R. 16. Ms. Brown testified that as a Meijer customer service manager, she supervised many employees and managed the customer service area, including the cashiers, service desk, cash office, costumer complaints, pricing integrity, cash control, hiring, and staff discipline. Nothing in the record appears to contradict her having these responsibilities as the Meijer manager. The ALJ's conclusion that Ms. Brown must avoid management responsibilities, yet serve as a customer service manager, requires explanation not found in the ALJ's decision.

The ALJ made the following statement in his opinion:

> . . . [t]he DDS doctors determined that the claimant did not have a severe physical impairment but that the claimant's organic mental disorder (chronic brain syndrome) and migraine impairment were *severe impairments that prevented her from performing her past relevant work* but not other work existing in significant numbers in the economy. *The undersigned [ALJ] agrees with these conclusions*, which are supported by the discussion below of the claimant's residual functioning and by further discussion at other steps of the sequential evaluation.

T.R. 19 (emphasis added). Despite agreeing with Drs. Kladder and Shipley that Ms. Brown's mental impairments prevented her from performing her past work, the ALJ concluded that Ms. Brown was capable of performing her past work. The finding that Ms. Brown is unable to perform her past work, with an apparently contradictory conclusion requires explanation not found in the ALJ's opinion. *See*

SSR 82-62 ("The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. . . [e]very effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."). Sufficient evidence doesn't support the conclusion that Ms. Brown could perform her past work.

## Step Five

If Ms. Brown couldn't perform her past work, the question becomes whether she has the capability of performing other work in the national economy. Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); 20 C.F.R. § 404.1520(g). A claimant who can perform a significant number of jobs available in the economy is not disabled. 20 C.F.R. § 404.1520(g). Substantial evidence in the record must support such a finding. Tom v. Heckler, 779 F.2d at 1254.

The ALJ found that since Ms. Brown's ability to perform a full range of work at all exertional levels was compromised only by nonexertional limitations, which had little or no effect on the occupational base of unskilled entry level work at all exertional levels, then pursuant to § 204 of the Medical-Vocational Guidelines ("the Grid"), Ms. Brown could perform jobs that existed in significant numbers in the national economy. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00; SSR 85-15.

The Grid was promulgated to establish the types and number of jobs that existed in the national economy for claimants with exertional impairments. *See*

20 C.F.R. § 416.1569. The Grid directs findings of "disabled" or "not disabled" based on common combinations of characteristics, but it doesn't account for nonexertional limitations,[8] such as Ms. Brown's depression, headaches, and resulting cognitive limitations. <u>Villano v. Astrue</u>, 556 F.3d 558, 564 (7th Cir. 2009) (citing 20 C.F.R. § 404.1569a(c); <u>Haynes v. Barnhart</u>, 416 F.3d 621, 628-629 (7th Cir. 2005)). When a claimant has nonexertional limitations that might significantly reduce the range of work she can perform, the ALJ can't rely on the Grid to find a claimant not disabled, but must instead consult a vocational expert to determine whether the claimant can perform a significant number of jobs. <u>Villano v. Astrue</u>, 556 F.3d at 564 (citing 20 C.F.R. § 404.1569a(d); <u>Haynes v. Barnhart</u>, 416 F.3d at 628-629; <u>Zurawski v. Halter</u>, 245 F.3d 881, 889 (7th Cir. 2001) (holding that "where a nonexertional limitation might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert")). While the ALJ consulted a vocational counselor, the record doesn't indicate that the ALJ considered the aggregate effect of all of Ms. Brown's ailments. <u>Clifford v. Apfel</u>, 227 F.3d 863, 873-874 (7th Cir. 2000). The ALJ must properly assess Ms. Brown's residual functional capacity, incorporating all of the relevant limitations from which she suffers, then determine whether she is capable of performing work. At the end of the day, the Commissioner bears the burden at step five, not Ms. Brown, <u>Clifford v. Apfel</u>, 227

---

[8] Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional. SSR 96-8p. It is the functional limitations or restrictions caused by medical impairments and their symptoms that are categorized as exertional or nonexertional. <u>Id</u>.

F.3d at 868, and any hypothetical ultimately posed to a vocational expert "must include all limitations supported by medical evidence in the record." <u>Stewart v. Astrue</u>, 561 F.3d 679, 684-685 (7th Cir. 2009).

In light of the ALJ's erroneous residual functional capacity determination and inconsistent findings, his determination that Ms. Brown isn't disabled isn't supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The record doesn't command a determination that Ms. Brown should be awarded benefits, but the ALJ hasn't adequately supported his conclusions.

CONCLUSION

For the foregoing reasons, the court REVERSES the final decision of the Commissioner of Social Security, and REMANDS the case for a hearing consistent with this opinion.

SO ORDERED.

ENTERED: <u>   December 3, 2009    </u>


<u>   /s/ Robert L. Miller, Jr.      </u>
Chief Judge
United States District Court